IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRIAN GILES, | ) | |
| | ) | Case No. 4:17CV3050 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **BRIEF IN SUPPORT OF MOTION TO** |
| THE CITY OF LINCOLN, TOM | ) | **RECONSIDER FILING NO. 75 AND** |
| CASADY, TIM LINKE, ERIC JONES, and | ) | **MOTION TO AMEND THE** |
| PATRICK BORER, in their individual and | ) | **PROGRESSION ORDER** |
| official capacities. | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the Plaintiff, Brian Giles, by and through his counsel, and pursuant to NECivR 7.1 and Fed. R. Civ. P. 16(b)(4), hereby submits this Brief in Support of his Motion to Reconsider Filing No. 75 and Motion to Amend Progression Order (Filing No. 92).

I.     **STANDARD OF REVIEW**

A.     **Motion to Reconsider**

Pursuant to Fed.R.Civ.P. 60(b) the "court may relieve a party ... from a final judgment, order, or proceeding...." The rule further enumerates several grounds under which a party may seeks relief and a catch-all provision stating a party may seek relief based on "any other reason that justifies relief." Fed.R.Civ.P. 60(b)(6).  Under Eighth Circuit law, "'the purpose of motions to reconsider is to correct manifest errors of law or fact or to present newly discovered evidence.' " *Arnold v. ADT Sec. Servs., Inc.,* 627 F.3d 716, 721 (8th Cir. 2010) (*quoting Hagerman* v. *Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988)).

B.     **Motion to Amend Progression Order**

Pursuant to Rule 16(b)(4), a case management order setting progression deadline "may be modified only for good cause and with the judge's consent." Fed.R.Civ.P. 16(b)(4). "The

primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements ...., [but the] 'existence or degree of prejudice to the party opposing the modification' and other factors may also affect the decision." *Bradford v. DANA Corp.,* 249 F.3d 807, 809 (8th Cir.2001).  In applying Rule 16, the overarching principle for the Court to follow is to construe and administer the Federal Rules "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P.1, *Marmo v. Tyson Fresh Meats, Inc,* 457 F. 3d 748, 759 (8th Cir. 2006).

## II.   THE COURT SHOULD RECONSIDER ITS RULING REGARDING THE TAYLOR-RILEY INVESTIGATION

### A.   KIMBERLEY TAYLOR-RILEY'S INVESTIGATION IS RELEVANT BASED UPON NEWLY DISCOVERED EVIDENCE

Plaintiff submits the newly-discovered report of the Amanda Benson Kimberley Taylor-Riley investigation for the Court's review to reconsider it's ruling regarding whether the investigation is relevant to Plaintiff's claims.  (Taylor-Riley Aff., Ex C, p. 1-40).  Taylor-Riley was the internal EEO officer for the City of Lincoln who investigated Troy Hurd's complaints of retaliation and Amanda Benson's complaints of harassment, discrimination, and retaliation pursuant to the internal EEO policy and the City's Equity and Diversity Plan.  (Taylor-Riley Aff. at 1, ¶1, Ex. A, p. 1-5; and Ex. B, p. 9-10)  Plaintiff obtained the Taylor-Riley report through his counsel's investigation in the *Benson v. City of Lincoln* matter, which is also currently pending before this Court.  (Brandon Aff. at 3, ¶10).  Recently, Plaintiff's counsel responded to the City's Motions to Dismiss in the *Benson* matter, which had been effectively stayed pursuant to the agreement of the parties several months due to the first scheduled *Hurd* trial.  (*Id.*).  The City filed its Motion to Dismiss the *Benson* matter on December 14, 2018, and Plaintiff's counsel responded to said Motion on January 4, 2019 shortly before the *Hurd* trial began in February,

2019. (*Id*.)  Plaintiff's counsel reviewed the Taylor-Riley report in conjunction with said Motion on January 2, 2019 and discovered several key admissions made by command staff personnel within the report, along with additional evidence regarding the underlying discriminatory conduct toward Benson. (*Id*.)  The admissions and findings by Taylor-Riley bear on issues that are central to Plaintiff's prima facie case or the issues of pretext.  Some examples are as follows:

<u>Protected activity/Good faith</u>

1) Eric Jones' admitted and Jeremy Phillips, another firefighter at Station 8 who worked with Benson and Mahler, confirmed that Brian complained about the disparate treatment Benson was receiving regarding the truck rotation. (Taylor-Riley Aff., Ex. C, p. 29-30, 33-34)  Jones acknowledged that he didn't adequately address the complaints. (Taylor-Riley Aff., Ex. C, p. 33-34) Brian also reported to Taylor-Riley that he complained five times during 2015 about Mahler's discriminatory manipulation of the truck rotation. (Taylor-Riley Aff., Ex. C, p. 26)  This confirms Brian's account of his protected activity throughout 2015.

2) Taylor-Riley found that Benson was treated much differently than her comparator, Mark Rist, in being allowed to ride on Mahler's truck. (Taylor-Riley Aff., Ex. C, p. 20)  Rist, the comparator evaluated, worked 1177 hours on Mahler's truck in comparison to Benson's 100 hours, which tends to prove Brian's complaints were made in good faith because they are supported by objective evidence of disparate discovered during the investigation. (*Id.*)

3) Bryan Kratochvil, who worked with Mahler at Station 8, told Taylor-Riley that Mahler stated "there was no room for women in the fire service" in his presence, which also tends to prove that Brian's complaints regarding Mahler's conduct were made in good faith because Mahler's statement indicates discriminatory intent. (Taylor-Riley Aff., Ex. C, p. 26)  Similarly, Derald Murrell, a former Battalion Chief for LF&R stated that Mahler does not feel

that women are equipped to be on the USAR team and that they are better suited to medical positions. (Taylor-Riley Aff., Ex. C, p. 23)

<u>Widespread Discriminatory /Retaliatory Practices and Other Claims</u>

4)  Taylor-Riley found that Chief Linke and other command staff members failed to respond to Benson's complaints of retaliation or follow up with directives of other command staff to monitor the Benson/Mahler interactions after her return to Station 8. (Taylor-Riley Aff., Ex. C, p. 33)

5)  Eric Jones admitted to Taylor-Riley that supervisors at LFR need training on equity, hostile work environment, and equality and that "LF&R needs a culture change." (Taylor-Riley Aff., Ex. C, p. 34)

6)  Chief Leo Benes admitted that he did not address Benson's continued complaints of a hostile work environment at Station 8. (Taylor-Riley Aff., Ex. C, p. 35)

7)  Taylor-Riley indicated that Mahler had similar issues as those alleged by Complainant with Andrea Deforge when he was at Station 5, but the witnesses were fearful to go on record. (Taylor-Riley Aff., Ex. C, p. 24-25)

The Taylor-Riley investigation covered far more than the December 5, 2015 incident referenced by the Court in its Order, including many of the issues related to Brian's protected activity and the events that led up the promotional decisions in this case.  Based upon a review of the report, Taylor-Riley interviewed and emailed multiple individuals in connection with this investigation.  (Taylor-Riley Aff., Ex. C, p. 4)  Based upon the Hurd investigation, Taylor-Riley is very thorough and there would be notes of those interviews and other supporting documentation contained within her investigatory file that is relevant to the issues of causation and pretext that the City intends to address in its anticipated motion for summary judgment.

4

(Filing No. 50-1 at 160, 213, 232, 264, 288 and 294). Taylor-Riley also performed well as the City's EEO officer, and City Attorney Jeff Kirkpatrick felt that her investigations of the Hurd and Benson matters were thorough and fair. (Taylor-Riley Aff., Ex. D-F generally and Ex. F, p. 3)

Plaintiff is asking the Court to reconsider its ruling regarding the Taylor-Riley investigation and allow for discovery of her investigatory file, her email correspondence, and Taylor-Riley's unrestricted deposition.

## III.   THE COURT SHOULD RECONSIDER ITS RULING REGARDING ESI

### A.   THE DOCUMENT PRODUCTION FROM THE LINKE/JONES EMAILS PROVES THAT THE COURT'S RULING WAS BASED ON INACCURATE INFORMATION

The City represented to the Court in connection with its Motion for Phased Discovery that there were 8,856 emails based on a search utilizing Ipro software performed by Jennifer Hansen-Richmond, the City's paralegal at the time, for the following search terms "Brian Giles", "Giles", "promotion", "promotional" and "Battalion Chief" for the Jones and Linke harvested emails. (Filing No. 46-2 at 3) The City ultimately produced 16,138 pages of documents from these two custodians' email accounts. (Brandon Aff. at 2, ¶6) Hansen-Richmond opined that "best practices dictate that keyword queries on custodian emails should be performed on e-discovery software, such as IPro, housed in the City Law Department rather than by IS [Information Services]" (Filing No. 46-2 at 2)

In late December 2018, Plaintiff's counsel reviewed the Linke and Jones' email productions to prepare for Brian Giles' deposition in January 2019. (Brandon Aff. at 2, ¶7) It took Plaintiff's counsel only 15.3 hours to review the email production because the majority of the production was irrelevant, contained duplicative emails and also several thousand pages of

logo signature pages. (*Id.*)  For example, in one folder of the Linke production marked "001" contained 1741 pages of emails, 555 or nearly one-third of the production was logo signature pages. (Robb Aff. at 1, ¶¶2-3, Ex. A and B, p. 1-5)

The search was over-inclusive because it contained the search term "Battalion", and Linke and Jones are both "battalion" chiefs.  (Brandon Aff. at 2, ¶8)  So, in essence, the search contained emails regarding the custodians' daily tasks that had absolutely nothing to do with this case just because of the custodians' signature line.  (*Id.*)  Of the 16,138 pages, Plaintiff's counsel printed emails that contained Giles and Benson's names or any email that could conceivably be relevant to the promotions process or the allegations in this case.  (*Id.*)  For Jones, those emails filled a portion of a 3-inch 3-ring binder which holds 500 pages of documents, or approximately 400 pages.  (*Id.*)  For Linke, those emails filled one 4-inch 3-ring binder that holds 800 pages. (*Id.*)  That amounts to approximately 1200 pages of documents of the 16,138 produced. (*Id.*)

Based on a comparison of the IS targeted terms search that was performed in the Hurd matter and this two-custodian search, the Giles search was inferior and a waste of resources.  The Hurd search produced 15,000 pages of very relevant ESI from thirteen command staff custodians for a five-year time period.  (Filing No. 51-2 at 5, ¶21)  The Giles production from only two custodians for a one-year time period produced 16,183 pages of mostly irrelevant information. (Brandon Aff. at 2, ¶7)  This comparison proves that the IS search methodology, deduplication, and stripping of irrelevant data such as the logo signature pages was far superior to the paralegal-directed search in this case.  Even with these large numbers, the review of this ESI did not take long and was not unduly burdensome because it was so irrelevant Plaintiff's counsel spent mere seconds flipping or clicking through the pages. (Brandon Aff. at 2, ¶9)

Furthermore, the Court misconstrued what Judge Bazis requested regarding the Motion to Compel. Judge Bazis specifically directed the parties to prepare their proposals for ESI during their conference for the Motion to Compel and also requested that the parties provide *detailed* background information on who the custodians were and why their email was important to this matter in their respective briefs. (Brandon Aff. at 1, ¶2) This is what Plaintiff's counsel endeavored to do. Plaintiff's proposal for command staff/management contained 12 City representatives with search terms "Giles (name variation that was performed in the Hurd matter); Benson, Mahler, Bopp, Cuttlers, Bastin, Mueller, promotion, retaliation, investigation" (Filing No. 51-15 at 1) The search terms were all the candidates for the promotion without Hurd (Giles, Bopp, Cuttlers, Bastin, Mueller) and the two relevant actors at Station 8 (Benson and Mahler), and the time period proposed was thirty-two months. (*Id.*) A similar search was performed for fifteen custodians in Hurd for a five-year time period and produced only 15,000 pages of documents. (Filing No. 51-2 at 5, ¶21) The Court's ruling based upon the original discovery request was in error when Judge Bazis specifically directed the parties to put forth an ESI proposal that she would consider. Of course, there was no way for the Court to know this or a need for the parties to explain this in their Motions or Briefing, as Judge Bazis was the sitting judge until July 2018. (Filing No. 63)

The Court based its ruling on proportionality in that Defendant asserted that it was unduly burdensome for them to search ESI because of the large numbers of emails contained within the City's numbers presented to the Court. (Filing No. 47 at 3) In reality, the Court was provided inaccurate information to lead it to this conclusion based on a faulty search. The City never provided the Court with the necessary information it needed to properly evaluate the ESI issue

from the very department that could run a targeted search, Information Services.  Now that the
two searches can be compared, Plaintiff is asking the Court to reconsider its ruling.

> **B.    THE INFORMATION SERVICES SEARCH OF COMMAND STAFF
> EMAILS IS FAR SUPERIOR AND PROPORTIONAL TO THE NEEDS
> TO THIS MATTER**

The search of City representative emails in Hurd produced highly relevant ESI that
supported Mr. Hurd's claims.[1]  When compared to the results of the paralegal-directed search of
only two custodians in this case, the IS search was far superior and is proportional to the needs of
this case.

| Search | Custodians | City Cost | Pages produced | Time period | Relevant Pages | Logo pages |
|---|---|---|---|---|---|---|
| IS (Hurd) | 15 | $10,000 | 15,000 | 1/11-10/16 | Vast majority | Very few |
| Paralegal-directed | 2 | Unknown | 16,138 | 9/14 – 12/15 | Approx. 1,200 | 1/4 to 1/3 |

> **C.    THE COURT FAILED TO CONSIDER ALL RELEVANT FACTORS IN
> ITS PROPORTIONALITY ANALYSIS**

When evaluating proportionality, the court should consider "the importance of the issues
at stake in the action, the amount in controversy, the parties' relative access to relevant
information, the parties' resources, the importance of the discovery in resolving the issues, and

---

[1] The Hurd matter was tried in February of 2019.  Much of Plaintiff's evidence originated from Kimberley Taylor-Riley's investigative file, as well as, the ESI search of command staff email.  (Brandon Aff. at 5, Ex. C, p. 1-15, 23-28)

whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed R. Civ. P. 26(b)(1). When faced with a discovery dispute, "[t]he court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." Fed. R. Civ. P. 26 advisory committee's notes.  The Court did not consider all these factors.

      1.      The Importance of the Issues

The Court committed manifest error in failing to recognize the importance of the constitutional issues at stake in this case, regardless of the amount in controversy.  Brian is claiming significant damage in this matter.  (Filing No. 53-7 at 10)  Even if the amount in controversy was much smaller, civil rights plaintiffs often face an uphill battle in discovering information that is in the sole possession of the Defendant employer.  The importance of protecting Brian's fundamental Constitutional rights, regardless of the amount claimed, is also a factor in the proportionality analysis that the Court did not consider.  *See, Fed. R. Civ. Proc.* 26(b)(1), Committee Notes[2] ; *Lucille Schultz v. Sentinel Insur. Co.,* 2016 WL 3149686, at *7 (D. S.D. June 3, 2016).

*In Daniels v. City of Sioux City*, 294 F.R.D. 509 (N.D. Iowa 2013), the Court considered the City's motion to bifurcate the case and stay discovery in a Sec. 1983 claim.  In overruling Defendant's Motion, the Court stated:

> My concern with the request to stay discovery is based, instead, on the congruity of depriving a litigant to access to information that is relevant to the merits of a constitutional claim…

---

[2] "It also is important to repeat the caution that the monetary stakes are only one factor, to be balanced against other factors. The 1983 Committee Note recognized 'the significance of the substantive issues, as measured in philosophic, social, or institutional terms. **Thus, the rule recognizes that many cases in public policy spheres, such as employment practices, free speech, and other matters, may have importance far beyond the monetary amount involved.'  Many other substantive areas also may involve litigation that seeks relatively small amounts of money, or no money at all, but that seeks to vindicate vitally important personal or public values.** *FRCP* 2015 Amendment Committee Notes (emphasis added).

…

There is no reason these principles should apply to a lesser degree in a Section 1983 case alleging that a local government maintains a policy of deliberate indifference of its citizens' constitutional rights…

…

A stay of discovery with regard to a Monell claim would, then, amount in most cases to a permanent stay. Litigants would rarely, if ever, have the opportunity to use interrogatories, document requests, depositions and other discovery tools to investigate policies and customs that may encourage unconstitutional abuses of power. I cannot imagine why this would be a desirable outcome. It has long been recognized that civil rights litigation involves more than the possible exchange of money. Justice Brennan stated:

[W]e reject the notion that a civil rights action for damages constitutes nothing more than a private tort suit benefiting only the individual plaintiffs whose rights were violated. Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.... Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefit that are not reflected in nominal or relatively small damages awards....

In addition, the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future.... This deterrent effect is particularly evident in the area of individual police misconduct, where injunctive relief generally is unavailable. *City of Riverside v. Rivera,* 477 U.S. 561, 574–75, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (citations omitted).

*Id.* at 511-513. (emphasis added)

Congress has expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit "does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance." *Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400, 402 (1968); *see also City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986). Plaintiff's step forward "to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *Id.* at 574.

"At issue here is much more than the simple question of how much [plaintiff's]

10

attorneys should receive as attorney fees.  At issue is . . . continued full and vigorous commitment to this Nation's lofty, but as yet unfulfilled, agenda to make the promises of this land available to all citizens, without regard to race or sex or other impermissible characteristic."

*West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 102 (1991) (Marshall, J., dissenting) (quoting *Hidle v. Geneva County Bd. of Educ.*, 681 F. Supp. 752, 758 (M.D. Ala. 1988) (alterations in original)).

The Court's ruling regarding proportionality completely omitted from its analysis the important issues that this case, regardless of the monetary outcome, serves to promote.  Plaintiff not only followed City policy but followed state and federal anti-discrimination and retaliation laws when he spoke up in support of not one, not two, but three co-workers who were being treated unlawfully.  His protected activity and the protections afforded to him are of primary importance to Congress and the very values on which the United States of America was built.  The Court has failed him in his quest to discover relevant information to achieve his goal of vindicating those very important rights.

### 2.    Amount in Controversy

In this case, Brian is claiming emotional distress damages, lost wages, loss of earning capacity, and his fees and costs.  Kent Jayne, a certified vocational rehab counselor and economist, valued Brian's economist lost in this case at 3.2 million dollars. (Filing No. 53-7 at 10)  Defendant has not retained an expert to refute Jayne's evaluation.

### 3.    Relative Access to Information

The Defendant is in sole possession of the ESI.  The Court did not consider this factor in its ruling either.

4.      Importance of Discovering Evidence

Electronically-stored information is critical to proving Plaintiff's case.  As an illustration from what has been discovered thus far from the Linke emails:  1)  Pat Borer expressed his thoughts on the candidates, "Thank you for reconsidering.  Chief Linke and the new Chief may well select the new person ***but this is more about buy in and loyalty than qualifications.";*** (emphasis added); 2) Roger Bonin stated:  "I think my first choice would be Shane, followed closely by Jeremy.  I think both would work to the best of their ***ability to further our goals.  The rest not so much."*** (emphasis added)(Brandon Aff., at 5, ¶¶ 22-23, Ex. A and B)

Both of these individual defendants are expressing that only loyalty to command staff, ***not qualifications for the position,*** should be considered when selecting the candidate.   Linke also testified that there was no email feedback regarding either promotion in 2015, which is clearly not true.  (Filing No. 50-6 at 20, 138:23-139:4)  This is the type of damning evidence that can only be discovered through electronically-stored information.  Borer, Bonin, or *any* of the command staff members who did not recommend Brian Giles could be communicating about him and the other candidates.  Denying Plaintiff, the opportunity to discover that evidence is manifest error.

The ESI is critical to Plaintiff's case as all of the ESI could go towards proving his protected activity, notice of his protected activity to LFR command staff, corroboration of his complaints/the retaliation against Benson, motives of LFR command staff who influenced Linke's decision; response to Brian's complaint to Jones of retaliation regarding the promotional decision; the basis for the alleged negative qualities espoused by LFR command staff in its position statement to the NEOC; any negative or positive comments about the other candidates

for the position, and "other acts" evidence to prove his widespread custom and practices theory or to prove pretext.

Additionally, as highlighted in evidence that was submitted in the Hurd trial, much of the proof in the Hurd case was obtained from ESI and the Kimberley Taylor-Riley investigative file. (Brandon Aff. at 5, ¶24, Ex. C, p. 1-15, 23-38)  Many of the communications came after the alleged adverse actions and post-Taylor-Riley investigation. (Brandon Aff. at 6, ¶27) That didn't make them any less relevant.

5.    Plaintiff's ESI Proposal is Not Unduly Burdensome

The cost to run four searches through the IS Department with far more search terms for a five-year time period was approximately $10,000 in the Hurd matter.  (Filing No. 51-2 at 3, ¶12; 51-11 at 1)  The cost for the remaining nine City representative emails would then equate to maybe $2000, if the search term Battalion is excluded from the representative search.  Until the searches are run by IS, even just for the Plaintiff's name, the Court has no way to determine whether the production of the ESI is unduly burdensome or not.  Based upon the name variation search that was performed for the same command staff custodians in Hurd at issue here, there were 6,279 emails total for a period of five years.  (Brandon Aff. at 5, ¶¶ 25-26, Ex. D)  The internal investigation by Kimberley Taylor-Riley regarding Hurd was initiated in 2012 and ran through 2014.  A large portion of command staff emails that contained Troy Hurd's name were in conjunction with his NEOC charges, the internal investigation, and the fallout from the media reports involving the investigation in 2015.  (Brandon Aff.  at 6, ¶27)  There was no internal investigation involving Brian Giles, and the internal investigation involving Amanda Benson only ran from January 2016 to May 2016.  The only reason there were 8,600 emails for Linke and Jones for a one-year time span for the search run by the City legal department in this case

was because "Battalion" was one of the search terms.  If a name variation search was run for the name Giles and the few search terms proposed by Plaintiff by IS for the nine remaining command staff members, the numbers would be far fewer than what was presented originally by the City to the Court.  This is proven by the Linke/Jones searches.  Those inflated numbers of "hits" originally presented along with the City's cost estimates just do not ring true based upon the comparison of the two searches.

The amount in controversy in this matter justifies this search, and the searches proposed are reasonable and proportional to the needs of Plaintiff's case.

## IV.    THE COURT'S RULING ON PHASED DISCOVERY IS BASED ON MANIFEST ERRORS OF LAW

### A.    BRIAN'S PROTECTED ACTIVITY IS IMPUTED TO THE CITY BASED UPON CASADY AND JONES' KNOWLEDGE

As originally argued to the Court, Tom Casady and Eric Jones were on notice of Brian's protected activity in this case.  (Filing No. 58 at 22-23)  Casady was on notice of Brian's participation in the Hurd investigation by virtue of reviewing the Taylor-Riley report, and Brian also met with Casady on January 8, 2015 on Troy's behalf and engaged in additional protected activity when he asked him to "fix" the retaliatory ways of command staff.  (Filing No. 53-1 at 3, ¶15)  This is undisputed.  Brian complained to Eric Jones five times throughout 2015 regarding the discrimination and harassment of Amanda Benson by Shawn Mahler.  (Filing No. 53-1 at 4, ¶19)  The newly-discovered Taylor-Riley report confirms this is what Giles reported to her; Jones admitted and various witnesses at Station 8 confirmed that Brian complained about the disparate treatment Benson was receiving regarding the truck rotation.  Jones acknowledged that he didn't adequately address the complaints.  (Taylor-Riley Aff., Ex. C, p. 26, 29-30, 33-34)

14

The Court's ruling regarding Linke being the focus of "Phase One" is manifest error because Plaintiff can prove that Linke had "constructive" knowledge of Giles' protected activity. Generally, to establish a prima facie case of retaliation, a plaintiff must show that "the employer had actual or *constructive knowledge* of the protected conduct." *Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 714-715 (2000). *See also, Simon v. Simmons Foods, Inc.,* 49 F.3d 386, 389 (8th Cir.1995). "The presence or absence of retaliatory motive is a legal conclusion and is provable by circumstantial evidence even if there is testimony to the contrary by witnesses who perceived lack of such improper motive." *Id., citing Ellis Fischel State Cancer Hosp. v. Marshall,* 629 F.2d 563, 566 (8th Cir.1980), cert. denied, 450 U.S. 1040, 101 S.Ct. 1757, 68 L.Ed.2d 237 (1981).

When high-ranking officials of an employer are on notice of the Plaintiff's protected activity, the Court can presume "corporate knowledge". In *Gordon v. New York City Bd. Of Educ.,* 232 F.3d 111, 117 (2nd Cir. 2000), the Court considered whether the jury instructions given regarding notice of protected activity were appropriate. The Defendant alleged that plaintiff was required to prove that the agents that carried out the allegedly discriminatory performance evaluations had knowledge of the protected activity, despite the fact that the Board of Education was on notice of the protected activity. *Id.* at 117  In holding that direct proof that notice to the agents of the school was unnecessary, the Court stated:

> The Board though, contends that to satisfy the fourth required element of causation, a plaintiff must show that the corporate agents who carried out the adverse action knew of the plaintiff's protected activity, and that therefore Judge Motley's jury charge was correct. The Eleventh Circuit has recently held as much. *See Raney v. Vinson Guard Service, Inc.,* 120 F.3d 1192, 1197–98 (11th Cir.1997). This Court, however, has consistently held that proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

15

conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant. *See Cosgrove,* 9 F.3d at 1039.

The lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment. *See Alston,* 14 F.Supp.2d at 312–13. A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge. *See id.* at 311. This is so, moreover, regardless of whether the issue of causation arises in the context of plaintiff's satisfaction of her prima facie case or as part of her ultimate burden of proving that retaliation "played a motivating role in, or contributed to, the employer's decision." *Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 222 (2d Cir.1997)

*Id.* (emphasis added)

Casady is the Director of Public Safety and supervises command staff at LFR and had knowledge of Brian's involvement in the Troy Hurd investigation because he received and reviewed Taylor-Riley's report and Brian also complained to Casady directly because he wasn't doing anything to remedy the retaliatory environment at LFR.  (Filing No. 50-1 at 14-123, Ex. 5; Filing No. 53-1 at 3, ¶15)  Command staff discussed the Hurd report at meetings, as well. (Filing No. 50-6 at 6, 68:6-14; at 8, 81:1-83:4, at 28-29, 172:15-173:1) (Filing No. 50-5 at 19-22, 189:24-200:4)  Multiple witnesses confirmed that Jones was aware of Brian's protected activity regarding Amanda Benson.  (Taylor-Riley Aff., Ex. C at 26, 29-30, 33-34)  Because these members of command staff were on notice of the protected activity and also were involved in the promotional decision-making process, that knowledge is imputed to Tim Linke.

"'If the employer has structured its organization such that a given individual has the authority to accept notice of a harassment problem, then notice to that individual is sufficient to hold the employer liable.'"  *Sims v. Health Midwest Physician Servs. Corp.*, 196 F.3d 915, 919-920 (8th Cir. 1999) (quoting Williamson v. City of Houston, 148 F.3d 462, 267 (5th Cir. 1988)).

"Constructive notice will be recognized 'where an employee provides management level personnel with enough information to raise a probability of [unlawful] harassment in the mind of a reasonable employer, or where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it.'" *Lake v. AK Steel Corp.*, 2006 WL 1158610 (W.D. Pa. May 1, 2006) (quoting *Kunin v. Sears Roebuck & Co.,* 175 F.3d 289, 293-94 (3d Cir. 1999)).

The Eighth Circuit has stated:

> The question is whether the employer knew or should have known of the harassment and failed to remedy it.  If authorized agents with a reporting duty (or persons reasonably believed to have such a duty) acquire knowledge of sexual harassment, then the corporation acquired such knowledge. Because [the plaintiff] presented an issue of fact as to [the employee]'s knowledge that [the plaintiff] was being harassed, we reverse the District Court's grant of summary judgment on her negligence claim.

*Sims v. Health Midwest Physician Services, Corp.,* at 921.  *See also Young v. Bayer Corp.,* 123 F.3d 672, 674-75 (7th Cir. 1997).

The Court's phased discovery will actually increase costs if the Court does not reverse itself given the law on general corporate knowledge.  Just because the leaders of LFR deny knowledge of the protected activity, that doesn't mean that Plaintiff can't prove an inference of that knowledge circumstantially.  Plaintiff should be allowed to harvest emails and depose command staff one time, and one time only, covering all areas necessary to prove his case on causation.

### B.   THE COURT'S ORDER DOES NOT ACCOUNT FOR THE MULTIPLE WAYS PLAINTIFF MAY PROVE PRETEXT

Because the Court's order is so focused on the knowledge component, the restrictions placed on deposition questioning in this case effectively preclude Plaintiff from proving the much more fact-intensive and broad issue of pretext.

The Court issued its Order limiting the first phase of discovery as to "whether a causal link exists between Plaintiff's alleged protected activity and the alleged adverse employment actions or injuries."  The Court also held that "Plaintiff's depositions of witnesses other than Linke will be limited to (a) what those witnesses knew, if anything, about Plaintiff's alleged protected activity prior to December 1, 2015, and (b) if prior to December 1, 2015, they communicated with Linke regarding his selections for promotion to Battalion Chief, and if so, what they said."  (Filing No. 75 at 7).  Such reasoning is arbitrary in that it appears the Court held that the scope of the first phase of discovery encompasses the entire causation prong of Plaintiff's retaliation prima facie case, but then also restricts Plaintiff's ability during depositions to discover evidence to two discrete issues: 1) Defendant's representatives' knowledge of Plaintiff's protected activity; and 2) what was communicated to Linke, the purported decisionmaker.  This ruling is manifest error because many avenues that Plaintiff may prove the promotional decision was pretextual that are foreclosed by the deposition restrictions that the Court implemented.

Pretext may be proven in the following ways:

1.  Failure to follow its own policies[3]

Plaintiff cannot inquire of any of the deponents regarding the policies for promotions or the City's employment policies.

2.  Disparate treatment of comparators.[4]

Plaintiff cannot inquire of the other candidates or how they were treated during the promotional process; how they were evaluated (during the promotional process or during their

---

[3] *Varner v. Nat'l Super Markets, Inc.*, 94 F.3d 1209, 1213 (8th Cir. 1996)
[4] *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013).

careers at LFR); or if they engaged in allegedly similar activity that Plaintiff was accused of in the City's position statement to the NEOC.

3. The proffered explanation is unworthy of credence[5];

In its position statement to the NEOC, the City of Lincoln represented to the NEOC the following basis for the promotional decision and why Brian Giles was not selected:

> After speaking with Complainant (Giles) and the rest of the candidates, Linke spoke individually with each of the Chief Officers to ascertain their thoughts on which candidate may be best suited for the first (1st) promotion. He asked them to comment on each candidate's experience, level of humility, adaptability, incident command skills, verbal and written articulation, team-orientation, innovation, collaborative ability, focus, and mentoring capabilities. All but one of the Chief Officers at the time indicated that Complainant was not the best candidate for promotion. A number of them indicated that they had concerns about his integrity, ability to keep personnel matters confidential, ability to follow through with assignments, and willingness to maintain a professional and collaborative approach with Chief Officers. They all agreed that Complainant is an excellent incident commander.

(Brandon Aff. at 6, ¶28, Ex. E, p. 9)

Plaintiff is entitled to ask all of the Battalion Chiefs who provided recommendations for the Battalion Chief positions why they think Brian lacks integrity; what examples did they have where he failed to keep personnel matters confidential; what assignments did he not follow through on or situations where he failed to maintain a profession or collaborative approach with Chief Officers. Without being able to explore these areas with all of the LFR Command Staff members who provided input, Plaintiff will be severely restricted in determining if these reasons were false to prove pretext.

4. Plaintiff's positive employment history prior to the promotion[6];

---

[5] *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 151 (2000).
[6] *Bevan v. Honeywell, Inc.,* 118 F.3d 603, 610 (8th Cir. 1997).

Plaintiff cannot ask any of the Battalion Chiefs about their professional experiences with Brian Giles.  He has been a long-standing member of the department and has worked with command staff for years.

  5.  Plaintiff is substantially more qualified than the other candidates[7]

Plaintiff cannot ask any of the Battalion Chiefs about their professional experiences with the other candidates.  How is he supposed to prove that he was substantially more qualified than the other candidates if he cannot ask the decisionmakers about their knowledge of the other people competing for the position.

  6.  Employer has a history of other claims or retaliation or discrimination[8].

Evidence of other acts of discrimination, especially those involving the same actors and occurring close in time to the discrimination at issue before the court, is relevant and not unfairly prejudicial.  The Eighth Circuit has explained the rationale for admitting this type of evidence to prove unlawful motive:

> Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices – evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant.  In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted with an unlawful motive.

*Estes,* 856 F.2d at 1103.

In *White v. Honeywell, Inc.*, 141 F.3d 1270 (8th Cir. 1998), the court reversed a defense verdict based on the exclusion of evidence that a manager used the word "nigger" outside the plaintiff's presence during a time outside the statute of limitations period and when he was no

---

[7] *Hase v. Missouri Dept. of Homeland Sec.,* 972 F.2d 893, 897 (8th Cir. 1982).
[8] *Duckworth v. Ford*, 83 F.3d 999, 1001 (8th Cir. 1996); Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1104 (8th Cir. 1988)

longer her supervisor.  *Id.* at 1275, 1277.

> This background evidence, if believed by the jury, would have helped White to demonstrate knowledge and an ongoing pattern of racial harassment and discriminatory animus directly linked to the management level at Honeywell.  We have long held that "[e]vidence of prior acts of discrimination is relevant to an employer's motivate . . ., even where this evidence is not extensive enough to establish discriminatory animus by itself."  *Estes*, 856 F.2d at 1104.

*Id.* at 1276.   The court discussed the "prejudice" the defendant claimed it would suffer if the statement was admitted:

> While the statement, because of its potential high probative value (if believed) is undoubtedly damaging and therefore in that sense prejudicial to Honeywell's case, it is not *unfairly* prejudicial.  It helps to define the essential background against which White's claim arose.  We conclude that the district court's decision to preclude White from using this highly probative piece of evidence affected her substantial rights in this racial discrimination case and that its probative value clearly outweighs the danger of any unfair prejudicial effect the statement may carry with it.

*Id.* at 1277 (emphasis added).  Ultimately, the court concluded that the trial court had abused its discretion and committed reversible error when it excluded the prior evidence of discrimination.

There are so many ways to prove pretext that the Court's order does not permit Plaintiff to inquire about in depositions that the decision violates Plaintiff's right to due process and potentially his right to jury trial.

### C.   THE DISCOVERY RESTRICTIONS IN THE COURT'S ORDER VIOLATE PLAINTIFF'S DUE PROCESS RIGHTS

Interestingly, cases involving mandatory arbitration support Plaintiff's due process argument.  Several courts have held that arbitration agreements that impose mandatory restrictions on the number of depositions or other modes of discovery in employment cases are so procedurally unfair that the agreements were rendered unconscionable based upon Plaintiff's right to due process.  *Fitz v. NCR Corp,* 13 Cal. Rptr. 3d 88 (Cal. Ct. App. 2004) (two

depositions and expert witnesses' depositions); *Ontiveros v. DHL Exp, 79 Cal. Rptr. 3d 471 (Cal Ct. App. 2008)* (one deposition); *Hulett v. Capitol Augo Grp., Inc.* No. 07-6151-AA, 2007 WL 3232283 (D. Or. Oct. 29, 2007); (three depositions); *Reid v. Optumhealth Care Solutions, Inc.,* No. 3:12-cv-00747-ST, 2012 WL 6738542 (D. Or. Oct. 11, 2012); (two days of depositions and one day of deposition of experts); *Jara v. JPMorgan Chase Bank, N.A*., No. B234089, 2012 WL 3065307 (Cal. Ct. App. July 30, 2012); (two depositions);  O*stroff v. Alterra Healthcare Corp.,* 433 F. Supp. 2d 538, 541 (E.D. Pa. 2006); *Domingo v. Ameriquest Mortgage Co.,* 70 Fed. App'x 919, 920 (9th Cir. 2003); (one deposition and depositions of any expert witness); Hooters of America, Inc. v. Phillips, 39 F. Supp. 2d 582, 601 (D.S.C. 1998) (one deposition); *Walker v. Ryan's Family Steak Houses, Inc.,* 400 F.3d 370, 387 (6th Cir. 2005) (one deposition); *Doubt v. NCR Corp.,* No. 07-3089-CL, 2008 WL 2705262 (E.D. Cal. Sept. 14, 2007) (two depositions and depositions of any expert witness); *Ferguson v. Countrywide Credit Industries, Inc.,* 298 F.3d 778, 781 (9th Cir. 2002).

These courts compare the restrictions imposed by the arbitration agreements to the broad and liberal rights guaranteed by federal courts and decided that even though the Plaintiff agreed to mandatory arbitration, the agreements or at least the procedural restrictions on discovery had to be struck because of the failure to give Plaintiff the opportunity to discover evidence necessary to prove his or her case.

Plaintiff did not agree to arbitrate his dispute.  He is entitled to broad and liberal discovery in this matter as a matter of right in federal court.  The Court's order violates his right to due process and is manifest error.

D.    **THE COURT'S STATED GOAL - TO SAVE ON EXPENSE – WILL NOT BE REALIZED THROUGH PHASED DISCOVERY**

Because Plaintiff has sufficient evidence to prove constructive or corporate knowledge of Plaintiff's protected activity and there are a myriad of ways to prove pretext that the Court's restrictive order does not allow Plaintiff to inquire about, the Order is actually will increase litigation expense in this case.  Because the Order is in error, if Plaintiff can muster up proof through his own investigatory efforts to overcome summary judgment, all of the same actors will need to be deposed again.  And if Plaintiff loses on summary judgment, Plaintiff will appeal due to the discovery restrictions that are preventing him from his right to free and liberal discovery under the Federal Rules.  The Court's order is counter-productive in lights of the facts of this case and controlling law that has been misapplied.

**V.      THERE IS GOOD CAUSE TO ENLARGE THE PROGRESSION ORDER TO ALLOW FOR ADDITIONAL PRODUCTION OF ESI, THE TAYLOR-RILEY INVESTIGATIVE FILE, AND UNRESTRICTED DEPOSITIONS**

On March 20, 2019, Defendant served supplemental Rule 26 disclosures identifying an additional 47 witnesses for this case.  (Brandon Aff., at 6 ¶29, Ex. F) Notwithstanding the restrictions imposed by the Court's order regarding the areas of questioning, there is no possible way that Plaintiff could complete discovery by April 1, 2019 of these witnesses.  Moreover, because of the restrictions regarding the manner in which Plaintiff can conduct depositions, which are limited to command staff members who communicated with Linke about the promotion, Plaintiff will be unable to discover the relevant evidence necessary to prove Plaintiff's prima facie case or to refute Defendant's alleged legitimate reasons as to why Plaintiff was not selected for the Battalion Chief's position.

The fundamental proposition that every law student learns in trial practice is "Don't ever ask a question on cross examination that you don't know the answer to."  *See American Bar Association's Guide to Direct Examination and Cross Examination,*

*https://www.americanbar.org/groups/gpsolo/publications/gp_solo/2014/september-october/a_guide_direct_examination_and_crossexamination/* ("The effective cross-examiner does not: Argue over irrelevant details, Ask a question without knowing the answer, Give a witness a chance to explain, Ask "Why?")

The Court's order prevents Plaintiff from deposing 61 witnesses[9] identified by the City thereby estopping Plaintiff from effectively cross-examining them to discover evidence to oppose the City's expected motion for summary judgment in this case.  The only witness that Plaintiff can effectively depose is Tim Linke.  This newly-discovered disclosure by the Defendants alone is sufficient good cause to continue the progression schedule in this matter.

It also bears mentioning that the City spent an inordinate amount of time arguing proportionality in the *Hurd* matter, like they have done in the instant matter.  They argued that because Hurd was still employed by the City, he had not suffered any economic loss, therefore, the Plaintiff should not be allowed to take particular depositions based on proportionality.  (Brandon Aff., at 6, ¶¶ 30-32, Ex. G and H)   Defendants argued to the Court in Hurd that individuals such as Jamie Pospisil and Eddie Mueller, two individuals involved in the training of Sara Khalil, were individuals that Plaintiff should not be able to depose based upon proportionality.  (Brandon Aff. at 6, ¶32)  Defendants also argued that these individuals were not important to prove that Hurd engaged in protected activity by reporting allegations of discrimination and retaliation in good faith.  (*Id.*)  Guess who the defendant ended up calling at trial?  Jamie Pospisil and Eddie Mueller.  (Brandon Aff. at 6-7, ¶33)  The list of witnesses called by the Defendant in the *Hurd* trial was as follows:

- Ashley Engler (not ever identified in Initial or Supplemental Disclosure)

---

[9] Plaintiff has not included Brian Giles, Troy Hurd, or Amanda Benson who are also listed on Defendant's Supplemental Rule 26(a)(a)(A) Disclosures

- Lloyd Eddie Mueller (argued that Plaintiff should not depose based on proportionality)

- Jamie Pospisil (argued that Plaintiff should not depose based on proportionality)

- Nancy Ellen Crist (identified and deposition not sought)

- Douglas John McDaniel (identified and Plaintiff deposed)

- Gregg Alan Fisher (not identified by Defendant until 9/26/18 after discovery closed)

- Thomas Kevin Casady (identified and Plaintiff deposed)

- Peter Eppens (not identified by Defendant until 9/26/218 after discovery closed)

- Jason Anthony Kruger (not identified by Defendant until 9/26/18 after discovery closed)

(*Id.*)

This Court did not allow the discovery deposition of Mayor Beutler in *Hurd*, who ended up being a crucial witness.  (Brandon Aff. at 7, ¶34, Ex. I)  Again, Plaintiff's counsel went into that trial deposition not knowing any of the answers to the questions that counsel would pose to the Mayor, the ultimate decisionmaker on matters of employment policy for the City of Lincoln. *See Neb. Rev. Stat.* §15-310.  The Court ruled similarly regarding Plaintiff's request to depose Dr. Jason Kruger,  after a belated disclosure.  The Court denied that request, too.[10]  (Brandon Aff. at 7, ¶35, Ex. J)

It is fundamentally wrong that Plaintiff did not have the opportunity to depose seven of the nine witnesses called by Defendant at trial in the *Hurd* matter without resistance or due to late disclosure from the City in order to effectively prepare for their cross-examination.  And the Court aided the City in that endeavor by constantly questioning Plaintiff's need for discovery based on the proportionality or the premise that somehow if Plaintiff did not pursue discovery,

---

[10] That ruling was also based on inaccurate information, in that Defendant asserted that Plaintiff had not disclosed several of their trial witnesses.  In actuality, Plaintiff disclosed all of them, except one, Ron Trouba, in their answers to interrogatories.  Had Defendant wanted to depose Captain Trouba after the discovery deadline, Plaintiff certainly would not have objected.  Brandon Aff., ¶37.

the Defendant might be interested in some sort of early resolution.  (Brandon Aff. at 6, ¶30, Ex. G, p. 1)  The City was not interested in the resolution of the *Hurd* matter, nor is it interested in resolution in this case.  Following the *Hurd* trial, Plaintiff's counsel reached out to the City on February 21, 2019 to inquire as to whether it was interested in settling all three matters, Hurd, Giles, and Benson.  (Brandon Aff. at 7, ¶36)  The City did not even respond to that email.  (*Id.*)

Likewise, the Court's restrictive limits on discovery in this matter based on proportionality are making it impossible for Plaintiff to prepare his case.  It is contrary to the purpose of free and liberal discovery to not allow Plaintiff to properly prepare for trial by deposing witnesses with relevant information that the Defendant has identified, particularly when the Plaintiff's civil rights are at stake.  Plaintiff's verdict in the *Hurd* matter confirmed that civil rights cases have value in this state.  (Brandon Aff., at 7, ¶37)  It also appears that Defendant is now conceding that witnesses disclosed in their Supplemental Rule 26(f) disclosures from the Hurd matter have discoverable information in this matter,  yet they argued that Plaintiff's allegations from the Hurd case were irrelevant in response to Plaintiff's Motion to Amend. (Brandon Aff. at 6, ¶29, Ex. F, p. 5); Filing No. 72 at 4)  The Defendant cannot argue out of both sides of its mouth.

Plaintiff has been diligent in pursuing this matter.  Plaintiff procured additional evidence prior to bringing this matter back before the Court for reconsideration and did so in a timely manner given the parties' heavy litigation schedule involving Hurd and Benson matters, along with Plaintiff's other cases.  The only other attorney working on this matter was out on an extended maternity leave from November 28, 2018 to January 21, 2018.

Defendant will not be prejudiced by this delay, as no trial date has been set and will actually benefit from not having to incur the cost of duplicative depositions and/or appeal if the

motion for summary judgment were to be granted.  There is good cause to amend the progression order and allow for discovery for the just, speedy and inexpensive handling of this matter.

Plaintiff is requesting that the Court continue the progression deadlines in this matter for period of one hundred and twenty days from the date the Court rules on this matter to allow for production of additional ESI, the Kimberley Taylor-Riley emails/investigative file, and for unrestricted depositions to proceed to allow for Plaintiff without phasing to properly prepare this matter for the City's dispositive motion and trial.

## VI.    CONCLUSION

Plaintiff respectfully prays for the following relief: 1)  Reconsideration of Filing No. 75 regarding Phase One Discovery to allow for the production of the Benson Taylor-Riley investigation/ESI and the remaining ten command staff/City personnel ESI custodians pursuant to the search as proposed by the Plaintiff; 2) Reconsideration of Filing No. 75 to allow for the unrestricted depositions of City representatives; and 3) amendment of the progression order to allow for an extension of the deposition/discovery deadlines for a period of one hundred twenty (120) days to complete discovery without phasing.

BRIAN GILES, Plaintiff

BY:     /s/ Kelly K. Brandon
        Kelly K. Brandon, #20734
        Stephanie J. Costello, #26309
        FIEDLER LAW FIRM, PLC
        20615 Highway 370
        Gretna, NE 68028
        (402) 316-3060
        (402) 513-6501
        kelly@employmentlawnebraska.com
        stephanie@employmentlawnebraska.com

        Attorneys for Plaintiff

27

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 22nd day of March 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all CM/ECF participants.


                                          /s/ Kelly K. Brandon_____